IRVING NEGER v. JOANNE NEGER.

Decided December 6, 1982.

Petition for certification granted.

IRVING NEGER v. JOANNE NEGER.

Decided January 24, 1983.

*Roy E. Kurnos* argued the cause for appellant (*Murphy, Kurnos & Nish,* attorneys).

*Vincent P. Celli* argued the cause for respondent.

IRVING NEGER, PLAINTIFF-APPELLANT, v. JOANNE NEGER, DEFENDANT-RESPONDENT.

Argued January 11, 1983—Decided January 24, 1983.

16

*Roy E. Kurnos* argued the cause for appellant (*Murphy, Kurnos & Nish,* attorneys).

*Vincent P. Celli* argued the cause for respondent.

The opinion of the Court was delivered by

SCHREIBER, J.

Plaintiff, Irving Neger, and defendant, Joanne Neger, were married in New Jersey in December 1973. One child, a daughter Carly, was born of the marriage in October 1977. The parties continued to live in New Jersey until September 1979 when they moved to California because plaintiff had obtained a lucrative position in that state. In December 1979, the defendant, after the family came to New Jersey for the holidays, chose not to return to California. Carly remained in New Jersey with the defendant whose decision not to return to California was motivated in part by the fact that she had no family or friends in California. The formal separation between plaintiff and defendant commenced on January 4, 1980. They devised an alternative pattern of custody that began in 1980 under which Carly resided with her father in California for about six weeks and then with her mother in New Jersey for about three and a half months.

Plaintiff filed a suit for divorce in the California Superior Court in April 1980. The defendant in response also sought a dissolution of the marriage. Both parties desired custody. The court bifurcated the divorce from the property, support and custody issues. On June 22, 1981, a final judgment of divorce was entered, jurisdiction being retained over custody, support and division of property. Thereafter the attorneys for the parties proceeded with negotiations to settle problems relating to distribution of the communal property.

The alternating physical custody arrangement continued unabated until a dispute erupted with respect to plaintiff's right to custody of his daughter during the 1981 summer. The defendant sought an order from the California court, claiming custody and asserting that the plaintiff was not fit to act as Carly's primary custodial parent. Nevertheless, the California court issued an order giving the plaintiff visitation rights from August 1, 1981 through September 12, 1981. Though this order had been served on defendant on July 30, 1981, she and the child were absent when the plaintiff came to New Jersey to obtain Carly at defendant's home. The plaintiff thereupon filed a motion with the California court to hold the defendant in contempt and to obtain custody of Carly. A hearing was held on all matters on August 6, 1981. The California court ordered temporary joint custody to be continued under the preexisting alternating scheme. The court also ordered that Carly be entrusted to the plaintiff for the seven-week period commencing August 14, 1981.

The parties ultimately reached an agreement on all issues. Their understanding was reduced to writing, approved by the California court in January 1982, and added as a supplement to the final divorce judgment. The agreement provided for "joint legal custody". The defendant was awarded "physical custody," subject to plaintiff's right of visitation as follows:

a. Generally said minor child will reside with Respondent [defendant Joanne Neger] for a period of 3½ to 4 months and then with Petitioner [plaintiff Irving Neger] for a period of approximately 6 weeks on an alternating basis.

b. Timing for future periods if visitation shall be mutually agreed upon between the parties, but shall include spending Christmas, 1981 with Petitioner. It is generally anticipated that future holidays will be alternated between the parties.

The parties continued to abide by the alternating custody plan until the defendant became concerned in the spring of 1982 that the custody arrangement would not be feasible beginning in September when Carly would commence school. The defendant requested that the schedule be amended to provide that Carly spend July 23 through August 28, 1982 in California and thereafter that she visit her father only during school vacation periods. The plaintiff objected, claiming that school authorities in both states could accommodate Carly under the existing custody schedule.

On June 29, 1982, the defendant filed in the California court an order to show cause seeking to modify the existing custody order. The plaintiff meanwhile obtained in that court an *ex parte* order confirming his right to Carly from July 23 to August 29, 1982. A hearing was held on July 20 to enforce the *ex parte* order, the defendant moving to vacate it. After that hearing, the California court ordered that the defendant adhere to the visitation order for the period from July 23 to August 29, that a family counselor communicate with the defendant for the purpose of interviewing her, and that the case be continued for further hearing on August 10. On August 10, plaintiff requested a continuance to allow time for both parents to submit to an agreed-upon psychological evaluation. The court continued the case to 1:45 p.m. on August 31, 1982 and extended custody in the plaintiff from August 29 until the conclusion of the hearing on August 31. The defendant's attorney was served with notice of the continuance. On August 20, 1982, the plaintiff filed an application requesting custody. This application was also scheduled for the August 31 hearing.

The court minutes indicate that plaintiff and his attorney were in court at 1:45 p.m. on August 31, 1982. Neither defendant nor her counsel was present. The case was called again at

3:30 p.m. and 3:55 p.m. Neither defendant nor her counsel had appeared or communicated with the court or plaintiff's counsel. The case then proceeded. Dr. Barrett, a court-appointed physician, testified that the plaintiff had made an appointment with him upon being informed of the court's request for an evaluation. Dr. Barrett saw Carly and her father on several occasions and did some testing. Since he had not heard from the defendant, Dr. Barrett telephoned her in New Jersey, and an appointment was arranged for 9:00 a.m. on Monday, August 30. The defendant did not arrive. Under the agreed-upon arrangements, the defendant was also to be present at 1:00 p.m. to be observed with Carly. The plaintiff brought Carly to the office at that time. The defendant was also there, and Dr. Barrett spent approximately 45 minutes with her. The examination was shortened because defendant wanted to spend some time with Carly, and it was agreed that the defendant would return the next morning at 7:00 a.m. She left with Carly and did not return the next morning.

Dr. Barrett testified that, while he had seen and done some testing of both parents and Carly, he had hoped to spend a few more hours with the defendant. In his opinion, it would be satisfactory to have the child remain with the father for the next school year, subject to visitation rights of the mother. He did not deem it wise to disrupt the peer relationship a five-year-old child would develop in school. Dr. Barrett also said, "the child might go back to New Jersey and flourish just as well." What was needed, in his opinion, was "a permanent arrangement where this child can have access to both parents given the geographic distance."

The court modified its extant order to award custody to the plaintiff until the end of the school year in June; during the summer Carly was to be returned to the defendant in New Jersey. The court left open what the custody arrangements would be thereafter, though its order recited custody would remain in the plaintiff until further order of the court.

 Instead of appearing at Dr. Barrett's office on August 31, the defendant had taken Carly and returned to New Jersey. She claims that she took this action on the advice of her counsel. After the court's decision, the plaintiff followed her to New Jersey and instituted proceedings under the Uniform Child Custody Jurisdiction Act ("UCCJA"), *N.J.S.A.* 2A:34–28 through –52, to enforce the California judgment.[1] He obtained an ex *parte* order in the New Jersey Superior Court, Chancery Division, directing that Carly be delivered to him and that the defendant show cause on September 10, 1982 why the California order should not be given full faith and credit. Before executing this order the Chancery Division judge had spoken by telephone with the California court and had been advised of what occurred on August 31, 1982 and that the California court had jurisdiction to modify the custody of the infant and award it to the plaintiff. The defendant filed a cross-motion seeking an adjudication that the California judgment was void because its court had no jurisdiction and that the Superior Court of New Jersey "has sole jurisdiction to make a child custody determination by modification" of the previous decree. The New Jersey court, after hearing argument on the return day, entered a final judgment for the plaintiff. It found the Superior Court of California had properly assumed jurisdiction to make a child custody determination and that the Superior Court of New Jersey did not have jurisdiction.

The defendant appealed to the Appellate Division. Finding that the California court did not have subject-matter jurisdiction, the Appellate Division reversed. 187 *N.J.Super.* 133 (1982). We granted plaintiff's petition for certification. 93 *N.J.* 15 (1982). The specific issues are whether under the UCCJA the New Jersey courts should enforce the California judgment and

---

[1] A certified copy of the California decree was filed with the Clerk of the Superior Court of this State and had "the same effect and [was entitled to] be enforced in like manner as a custody decree rendered by a court of this State." *N.J.S.A.* 2A:34–43.

whether under the UCCJA the New Jersey courts may properly modify the custody judgment of the California court. Because the principal issue involved custody of a minor and the attendant urgency due to the need of the child to begin school, we issued an order without opinion 93 *N.J.* 15. Our order reversed the judgment of the Appellate Division and reinstated the judgment of the Superior Court, Chancery Division. This opinion now follows.

The United States Supreme Court has not clearly delineated the impact of the Full Faith and Credit Clause, *U.S. Const.,* Art. IV, § 1, on custody adjudications. See *New York ex rel. Halvey v. Halvey,* 330 *U.S.* 610, 67 *S.Ct.* 903, 91 *L.Ed.* 1133 (1947) (holding New York could lawfully modify a Florida custody decree because Florida court had right under Florida law to change the decree); *May v. Anderson,* 345 *U.S.* 528, 73 *S.Ct.* 840, 97 *L.Ed.* 1221 (1953) (holding Ohio need not give full faith and credit to Wisconsin custody judgment because Wisconsin did not have personal jurisdiction over mother who was in Ohio with children at time process was served; Wisconsin had been matrimonial domicile and father had remained there); *Kovacs v. Brewer,* 356 *U.S.* 604, 78 *S.Ct.* 963, 2 *L.Ed.*2d 1008 (1958) (holding North Carolina had authority to modify New York custody decree if the North Carolina court found changed circumstances, because New York decree was modifiable under New York law on showing of changed circumstances); *Ford v. Ford,* 371 *U.S.* 187, 83 *S.Ct.* 273, 9 *L.Ed.*2d 240 (1962) (holding South Carolina not bound by Virginia court's order of dismissal after being informed of an agreement regarding custody, because Virginia law did not require that courts would be bound by agreements between parents with respect to custody of their children). *See also Borys v. Borys,* 76 *N.J.* 103, 109–115 (1978) (discussing judicial applications of the Full Faith and Credit Clause to custody decrees).

The positions espoused in these decisions unfortunately encouraged child snatching by a parent, which was condoned,

even rewarded. *See, e.g., Casteel v. Casteel,* 45 *N.J.Super.* 338 (App.Div.1957). This situation, encouraged by the void in the federal judicial scheme, led to the formulation in 1968 of the Uniform Child Custody Jurisdiction Act (UCCJA) by the National Conference of Commissioners on Uniform State Laws. 9 *U.L.A.* 111, 116 (master ed. 1979). The UCCJA was designed to foster stability in custody awards and discourage "seize-and-run" tactics by forum-shopping parents. *See E.E.B. v. D.A.,* 89 *N.J.* 595, 607 (1982); Foster & Freed, "Child Snatching and Custodial Fights," 28 *Hastings L.J.* 1011 (1977); Bodenheimer, "Interstate Custody," 14 *Fam. L.Q.* 203 (1981).

New Jersey is one of 47 states that have enacted the UCCJA.[2] The legislative sponsors' statement to the bill referred to the evils to which the act was addressed and the goals to be attained:

> There is no certainty as to which state has jurisdiction when persons seeking custody of a child approach the courts of several states simultaneously or successively. There is no certainty as to whether a custody decree rendered in one state is entitled to recognition and enforcement in another; nor as to when one state may alter a custody decree of a sister state.
>
> This uniform act seeks to bring order to the existing state of confusion regarding child custody decrees. Underlying its provisions is the idea that to avoid jurisdictional conflicts, a court in one state must assume major responsibility to determine who is to have custody of a particular child. [Senate Judiciary Comm., Statement on A. 361, 1979 Legis.Sess., at 11 (April 26, 1979)]

Two main threads run throughout the act. The first bears upon when a state should exercise original jurisdiction in a custody proceeding, that is, when no other state is in the midst of custody proceedings or has made a custody award after such proceedings. The primary legislative purpose of these provisions relating to original jurisdiction is to

> [a]ssure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this State decline the

---

[2] It has not been adopted in Massachusetts, Mississippi and Texas.

exercise of jurisdiction when the child and his family have a closer connection with another state. [*N.J.S.A.* 2A:34–29(c) ][3]

---

[3]The fundamental initial jurisdictional sections are *N.J.S.A.* 2A:34–31 and –34. They read as follows:

[*N.J.S.A.* 2A:34–31. *Jurisdiction of Superior Court*]

a. The Superior Court of the State of New Jersey has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with the State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected; or

(4) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

b. Except under paragraphs (3) and (4) of subsection a., physical presence in this State of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination.

c. Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.

[*N.J.S.A.* 2A:34–34. *Simultaneous proceedings in other states*]

a. A court of this State shall not exercise its jurisdiction under this act if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this act, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons.

b. Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties pursuant to section 10 of this act [*N.J.S.A.* 2A:34–37] and shall consult the child custody registry established pursuant to section 17 of this act

■ The second significant statutory strand relates to enforcement and modification of a custody decree of another state.[4] This is a vital element in accomplishing the stability that the act seeks to attain. These sections have been described as the "key provisions" of the act. Bodenheimer, "The Rights of Children and the Crisis in Custody Litigation," 46 *U.Colo.L.Rev.* 495, 501 (1975). Their aims, expressed in the Legislature's findings stated in the statute, *N.J.S.A.* 2A:34-29, are to

[a]void jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well being;

. . . . . . . . .

[d]eter abductions and other unilateral removals of children undertaken to obtain custody awards;

[a]void relitigation of custody decisions of other states in this State insofar as feasible; [and]

[f]acilitate the enforcement of custody decrees of other states.

Awareness of these two concepts, (1) when our courts should exercise jurisdiction in the absence of a custody decree or of ongoing proceedings in another state and (2) when our courts

---

[*N.J.S.A.* 2A:34-44] concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state.

c. If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with sections 20 through 23 [*N.J.S.A.* 2A:34-47 to -50]. If a court of this State has made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum.

[4]*See N.J.S.A.* 2A:34-41 and -42, quoted *infra* at 29; *see also N.J.S.A.* 2A:34-43.

should exercise jurisdiction to modify a decree of another jurisdiction, is crucial because not all the statutory criteria and policy considerations for both are the same. This case deals with the latter situation, modification of a custody determination. California, at the instance of both parents, had made the initial custody decision. Thereafter, the New Jersey courts were requested by the plaintiff to enforce that order and by the defendant to modify that order.

The defendant and the Appellate Division misconceived the issues, due in large part to their failure to acknowledge the difference between jurisdiction to make an initial custody decree and jurisdiction to modify a custody decree. Although more than one state may potentially have initial jurisdiction, the litigation invoking original jurisdiction should ordinarily commence in the state with which the child and his family have the closest connection and where significant evidence concerning the welfare of the child is more readily available. *N.J.S.A.* 2A:34–34. The UCCJA admonishes the courts to "decline the exercise of [initial] jurisdiction when the child and his family have a closer connection with another state." *N.J.S.A.* 2A:34–29(c). The point is that the initial jurisdictional provisions do not come into play when there is a prior custody decree in another state that continues to have jurisdiction.[5]

Two provisions in the statute establish the guidelines concerning the deference to be accorded custody decrees of another state, *N.J.S.A.* 2A:34–41 and –42. These are the key provisions that inhibit child snatching and "guarantee a great measure of security and stability of environment to the 'interstate child' by

---

[5]The Appellate Division inappropriately relied on initial jurisdiction cases such as *In re the Marriage of Ben-Yehoshua,* 91 *Cal.App.*3d 259, 154 *Cal.Rptr.* 80 (1979), in which the mother sought *initial* jurisdiction in California though it was not the home state and the family relationship to California was insubstantial, the complaint having been filed two weeks after she and three children arrived in California. 187 *N.J.Super.* at 138. It also concluded that initial jurisdiction could exist only in the home state, overlooking the statutory provisions that provide otherwise. *Id.*

discouraging relitigations in other states." UCCJA § 13 commissioners' note, 9 *U.L.A.* 151 (master ed. 1979). They read as follows:

[*N.J.S.A.* 2A:34–41. *Recognition of out-of-state custody decrees*]

The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this act or which was made under factual circumstances meeting the jurisdictional standards of this act, so long as the decree has not been modified in accordance with jurisdictional standards substantially similar to those of this act.

[*N.J.S.A.* 2A:34–42. *Modification of custody decree of another state*]

a. If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this act or has declined to assume jurisdiction to modify the decree, and (2) the court of this State has jurisdiction.

b. If a court of this State is authorized pursuant to subsection (a) a. [*sic*] and to section 9 of this act [*N.J.S.A.* 2A:34–36] to modify a custody decree of another state it shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section 23 of this act [*N.J.S.A.* 2A:34–50].

 These provisions mandate in the first instance that New Jersey must recognize the California custody decree if California "had assumed jurisdiction under statutory provisions substantially in accordance with" the UCCJA, so long as the decree has not been modified in accordance with the standards similar to those of the UCCJA. Moreover, New Jersey may not alter the California decree unless (1) California does not *now* have jurisdiction under the jurisdictional prerequisites of the UCCJA or has declined to assume jurisdiction, and (2) New Jersey has jurisdiction. In short, there is no concurrent jurisdiction to modify a decree under the act.

Recently the California Supreme Court, in *Kumar v. Superior Court*, 32 Cal.3d 689, 652 P.2d 1003, 186 Cal.Rptr. 772 (1982), had occasion to consider enforcement of a New York custody decree and the difference between initial jurisdiction over custody and modification of custody. The parties were divorced in New York in 1974 and custody of their child was awarded to the mother. All parties continued to live in New York until 1979

when the wife and child went to California to live. The father registered the New York custody decree in California and, as plaintiff, sought to enforce his visitation rights. The mother responded by attempting to modify the custody and visitation provisions of the New York order. The plaintiff also moved in New York to modify the custody and visitation provisions of its order. The New York court, finding that the defendant had interfered with plaintiff's visitation rights, held that the defendant had violated its order and suspended future alimony and support. The California Supreme Court held that California had no authority under the UCCJA to modify the New York order unless New York declined jurisdiction.

The California Supreme Court reasoned that the jurisdictional claims were not to be viewed as though the parties "were involved in an initial custody dispute, with competing concurrent jurisdiction." *Id.* at 696, 652 *P.*2d at 1008, 186 *Cal.Rptr.* at 772. In that event, a stated goal of the UCCJA is to "[a]ssure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection . . . ." *Cal.Civ.Code* § 5150; *accord N.J.S.A.* 2A:34–29(c). Rather, the statutory provisions concerning modification must be applied. The Court made the following pertinent observations:

> *Initial* jurisdiction is determined by the guidelines of section 5152 [*N.J.S.A.* 2A:34–31], which point to the state with the closest connections to the child and to information about his present and future well-being. *Modification* jurisdiction is perhaps best viewed as an extension of the recognition and enforcement provisions of the Uniform Act. California is not effectively enforcing the New York decree if it modifies the decree as soon as the child has spent six months within its borders. Under section 5163 [*N.J.S.A.* 2A:34–42], the strong presumption is that the decree state will continue to have modification jurisdiction until it loses all or almost all connection with the child. If that state has lost contact, the analysis begins again with section 5152 [*N.J.S.A.* 2A:34–31] to determine which other state has closest contact. [32 *Cal.*3d at 698–699, 652 *P.*2d at 1009–10, 186 *Cal.Rptr.* at 778–78 (emphasis in original) (citations and footnote omitted)]

The California Supreme Court declared "*all* petitions for modification must be addressed to the state which rendered the original decree if that state had and retains jurisdiction under

the standards of the act." *Id.* at 698, 652 *P.2d* at 1009, 186 *Cal.Rptr.* at 778. We believe that the *Kumar* opinion correctly states the impact and principles of the UCCJA.[6]

We turn next to the application to this case of these principles, in particular whether under *N.J.S.A.* 2A:34–41 New Jersey is obligated to enforce the California order.

California had adopted the UCCJA in 1973. *Cal.Civ.Code* §§ 5150–74. Its provisions are substantially the same as those in the New Jersey statute.[7] There is literal compliance with the statutory test. *See, e.g., State ex rel. Butler v. Morgan,* 34 *Or.App.* 393, 578 *P.2d* 814 (1978). The California court had assumed jurisdiction under the statute. Moreover, the California decree had not been modified when the matter was presented to the New Jersey Superior Court. Therefore, the elements of *N.J.S.A.* 2A:34–41 were satisfied when the plaintiff sought to enforce the California order.

The defendant attempted to modify that order in New Jersey. To do so, it was incumbent upon her, under *N.J.S.A.* 2A:34–42, to show (1) that the California court did not have jurisdiction in September 1982 "under jurisdictional prerequisites substantially in accordance with" the UCCJA or "ha[d] declined to assume jurisdiction to modify the decree", and (2) that the Superior Court of New Jersey has jurisdiction under the criteria of the UCCJA.

---

[6]In *L.F. v. G.W.F.,* 183 *N.J.Super.* 195 (App.Div.1982), a New Jersey court was called upon to modify its custody decree, the mother having been permitted to take the child to and reside in Pennsylvania, and the mother and child having lived thereafter in Pennsylvania for about five years. The court, applying *N.J.S.A.* 2A:34–31, held it no longer had jurisdiction.

[7]We know of no California cases, viable in light of *Kumar,* that interpret any pertinent section of the UCCJA that are in substantial conflict with our reading of that statute. Further, we recognize that the Appellate Division's mistaken view of California law under the UCCJA may be explained by the fact that it did not have the benefit of the later-reported *Kumar* opinion at the time it reviewed the trial court's declination of jurisdiction.

With respect to California's jurisdiction, it is undisputed that its Superior Court did not decline to assume jurisdiction, but in fact exercised jurisdiction. Its custody hearings were concluded on August 31, 1982 and its order is dated September 3, 1982. Modification was sought in New Jersey approximately one week later in response to plaintiff's attempt to enforce the California order in this State. The only significant changes that occurred before the Chancery Division heard the modification matter were the defendant's removal of the infant to New Jersey and her acquisition of physical custody of the infant.

*Jurisdictional conditions are prescribed in Cal.Civ.Code § 5152. Accord N.J.S.A.* 2A:34–31 (New Jersey parallel section). There are four alternative groupings. The California court's jurisdiction was clearly not based on two of those alternatives. In one, the child must have been abandoned or an emergency must have existed arising out of actual or threatened mistreatment, abuse or neglect. *Cal.Civ.Code* § 5152(1)(c); *accord N.J.S.A.* 2A:34–31(a)(3). That obviously does not apply.

In the other, California's jurisdiction would have existed if it had been (1) the "home state" at the time custody proceedings commenced, or (2) had been the "home state" within six months before commencement of the proceeding and the child had not been in California because of her removal by a parent and one parent had continued to live in California. *Cal.Civ.Code* § 5152(1)(a); *accord N.J.S.A.* 2A:34–31(a)(1). The statutory definition of "home state" is the state in which the child immediately preceding the time involved lived with his parent "for at least six consecutive months ...." *Cal.Civ.Code* § 5151(5); *accord N.J.S.A.* 2A:34–30(e). Periods of temporary absence are counted as part of the six-month period. *Cal.Civ. Code* § 5151(5); *accord N.J.S.A.* 2A:34–30(e).

As noted previously, the plaintiff and defendant had arranged for alternating physical custody of Carly. Under this arrangement the defendant had physical custody in California during the following periods:

*1980*

July to mid-August,
November to mid-December,

*1981*

March to mid-April,
mid-August to mid-October,
November 28 to mid-January 1982

*1982*

March to mid-May,
July 23 to August 30,
mid-September to present.

This record does not satisfy the statutory six-consecutive-month requirement. Carly had not lived with her father in California for six consecutive months "within six months before commencement of the proceeding" involving custody in the California court. It is also arguable that this requirement was not satisfied in New Jersey either where custody proceedings did not commence until September 1982. Carly had resided with her father in California for approximately 3½ of the six months immediately preceding commencement of the New Jersey action and had not lived with her mother for six consecutive months within the prior six-month period. A contention that Carly's absence from New Jersey was temporary and therefore should not be counted as part of a six-month period assumes that residing with her father was only a visit. However, the arrangement here was not truly characteristic of a visit, but consisted of fixed substantial periods of time in a regular alternating manner unrelated to holidays or vacations. It is possible, of course, that there may be no home state. *See, e.g., In re the Marriage of Hubbard,* 315 *N.W.*2d 75 (Iowa 1982) (after Iowa divorce in 1976 in which mother was awarded custody of three children, mother and children moved so frequently before custody modification instituted in Iowa in 1979, that there was no "home state").

California apparently assumed jurisdiction under a third[8] category, which requires that the child and the plaintiff father have "a significant connection with [that] State," and that there was available "substantial evidence concerning the child's present or future care, protection, training and personal relationships." *Cal.Civ.Code* § 5152(1)(b). The identical provision is found in *N.J.S.A.* 2A:34–31(a)(2).

The New Jersey trial court, complying with the suggestion in *E.E.B. v. D.A.,* 89 *N.J.* 595, 612 (1982), telephoned the California court and was advised that that court had assumed jurisdiction and modified its previous custody order. The September 3, 1982 custody order of the California court made no express jurisdictional findings. The defendant, of course, could have sought an explicit statement of the California court's basis of jurisdiction under the statute, and, if dissatisfied with its factual findings and legal conclusions, invoked the appellate process. This she failed to do.

Indeed, the defendant had invoked the jurisdiction of the California Superior Court to hear and determine the custody issue on at least two separate occasions, including the hearing of August 31, 1982. She never objected to the custody hearings before that court. The plaintiff and the court may well have been lulled into a belief that jurisdiction was not an issue. Thus the record may not be as complete as it would have been if the defendant had questioned the authority of the California court. Here the parties believed that there was jurisdiction. The record does establish, at least prima facie, the jurisdictional requisites.

---

[8]The fourth category is a residual provision granting jurisdiction where no other state satisfies the emergency, home state, or substantial contacts tests or where another state has declined to exercise jurisdiction on the ground that New Jersey is a more appropriate forum. *N.J.S.A.* 2A:34–31(a)(4). In light of our finding that California satisfied the substantial contacts test, this section is not applicable.

■ Though, perhaps, parties may waive the statutory jurisdictional predicates, we are mindful that parties may not confer subject-matter jurisdiction on a court when such jurisdiction does not exist. Jurisdiction in the personal sense requires compliance with constitutional due process. All parties were before the court, so *in personam* jurisdiction is unquestioned. *See Kulko v. Superior Court,* 436 *U.S.* 84, 98 *S.Ct.* 1690, 56 *L.Ed.2d* 132 (1978). There is no question but that jurisdiction over the status of the child's relationships to her parents was satisfied since California has a sufficient connection with the child. For a discussion of the effect on due process constitutional requirements of the UCCJA and the Parental Kidnapping Prevention Act of 1980 § 7, 28 *U.S.C.A.* § 1738A note (West Supp.1982), see Coombs, "Interstate Child Custody: Jurisdiction, Recognition, and Enforcement," 66 *Minn.L.Rev.* 711 (1982).

A significant relationship with California is evident. California had served as the last matrimonial domicile of the family. Thereafter the plaintiff continued to live in California. Carly has resided there for considerable periods of time, for approximately four months in the eight-month period ending August 31, 1982 and for approximately four and one-half months in the 1981 calendar year. Moreover, the defendant has not shown that there was not available in California substantial evidence concerning Carly's present and future care, protection, training and personal relationships. *Cf. L.F. v. G.W.F.,* 183 *N.J.Super.* 195 (App.Div.1982) (wherein decree state lacked modification jurisdiction because it no longer satisfied significant connection and substantial relationship tests); *Hache v. Riley,* 186 *N.J.Super.* 119 (Ch.Div.1982) (same). There was testimony presented by Dr. Barrett, a court-appointed counselor, about the welfare and best interests of the child. Though the doctor would have preferred to examine the defendant in greater detail, his inability to do so was due to the defendant's failings. It was the defendant who aborted the attempt to have a complete examination of her relationship with Carly.

■ The defendant, contrary to the court order, took physical custody of her daughter and left the state. However, the defendant's conduct—or asserted misconduct—was not the reason the New Jersey Chancery Division refused to exercise jurisdiction. Rather, we perceive that the Chancery Division's action was grounded on the statutory concern relating to the child's continued contact in the decree state. We note, however, that "[u]nless required in the interest of the child," the court was not authorized to exercise jurisdiction to modify the custody decree if the child's removal to New Jersey violated the plaintiff's right to physical custody. *N.J.S.A.* 2A:34–36(b). *See Stevens v. Stevens,* 177 *N.J.Super.* 167 (App.Div.1981).

■ Under all these circumstances, we are satisfied that the defendant has not demonstrated that the California court did not have jurisdiction. This finding is consonant with the underlying statutory UCCJA policy to discourage child snatching, avoid jurisdictional competition, and create greater stability in this field, thereby sparing the children harm.

■ The decision we have reached conforms with comparable provisions in the Parental Kidnapping Prevention (Wallop) Act of 1980 § 7, 28 *U.S.C.A.* § 1738A note (West Supp.1982). The federal scheme is similar to that of UCCJA. The Wallop Act requires every state to enforce the child custody decree of another state and not to modify it unless the court that has issued the order no longer has or has declined to exercise jurisdiction and the forum court has jurisdiction. 28 *U.S.C.A.* § 1738A(f). Initial jurisdiction, however, is centered on the home state. Home state is generally defined to be the state where the child has lived with a parent at least six consecutive months. If no state qualifies as the home state, then that state in which the child and at least one parent have a "significant connection," other than mere physical presence, and in which there is available in the state substantial evidence "concerning the child's present or future care, protection, training and per-

sonal relationships" is qualified. 28 *U.S.C.A.* § 1738A(c).[9] Since Carly arguably had no home state, and California satisfied the "significant connection" and substantial evidence" tests, there may have been compliance with the Wallop Act.[10] Moreover, the Wallop Act does not expressly prohibit a state under its law from enforcing a custody decree that is not enforceable under the federal act. Therefore, even if the Wallop Act did not apply, the California decree was entitled to recognition and enforcement in New Jersey under the UCCJA.

As we have previously observed, the defendant had a right to challenge in California the findings of the California Superior Court. Indeed, the California court did not intend that its custody decree be permanent or unalterable. The California court heard some evidence from a neutral expert, Dr. Barrett, on what custody arrangement would best serve the interest and welfare of Carly. The doctor testified that custody in either parent would fulfill that interest, but that split custody during the school year was neither warranted nor desirable. We mention this evidence not to justify the California order, but only to reflect that the defendant still has the opportunity to convince the California court that her daughter's welfare and best inter-

---

[9]Under the Wallop Act, jurisdiction may also exist in a state where a child has been abandoned or subjected to or threatened with mistreatment or abuse; in a state where the best interest of the child warrants assumption of jurisdiction and no other state meets the jurisdictional requirements; or in a court which has made a custody decision consistent with the act if the child remains in the state and that court has jurisdiction under state law. 28 *U.S.C.A.* § 1738A(c).

The language used to describe "home state," "significant connection," and "substantial evidence" in the Wallop Act tracks that in the UCCJA. *Compare 28 U.S.C.A.* § 1738A(b), (c) *with N.J.S.A.* 2A:34–30, –31.

[10]We acknowledge that there are many differences between the UCCJA and the Wallop Act, none of which are relevant to the controversy before us. The nature and resolution of those conflicts are properly left for another day. *See* Coombs, "Interstate Child Custody: Jurisdiction, Recognition and Enforcement," 66 *Minn.L.Rev.* 711, 822–34 (1982) (discussion of Wallop Act's preemption of state law).

ests are with her in New Jersey. We are confident that the California court, upon defendant's request, will afford her that opportunity at the end of the school year, particularly in view of the fact that she aborted the prior opportunity by leaving that jurisdiction on the advice of her counsel.

In accordance with our judgment heretofore entered, the judgment of the Appellate Division has been reversed and the judgment of the Superior Court, Chancery Division, reinstated.[11]

*For reversal and reinstatement*—Chief Justice WILENTZ and ⋅Justices CLIFFORD, SCHREIBER, HANDLER, POL-LOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.

---

[11]There has been brought to our attention a series of five orders dated September 17, 1982 and an order dated November 18, 1982 affecting the custody of Carly and modifying the California decrees entered by a different judge sitting in the Chancery Division. The defendant filed her appeal on September 13, 1982 and those orders entered thereafter are questionable. *See R.* 2:9–1(a). In view of our order and decision herein, the aforesaid trial court's orders are of no effect.