552 A.2d 38

**Ann HARRIS**

v.

**Jonathan A. MELNICK.**

**No. 18, Sept. Term, 1988.**

Court of Appeals of Maryland.

Jan. 19, 1989.

Lary Cook Larson (Charles Martinez, Eccleston and Seidler, on brief), Baltimore, for appellant.

Melvin J. Kodenski (Victoria A. Steffen, Kodenski & Canaras, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

This appeal concerns the proper analysis for determining, where there are multi-state contacts, whether this State can and should exercise jurisdiction over a request to modify the visitation aspects of a child custody order originally entered here. The analysis involves both the Maryland Uniform Child Custody Jurisdiction Act (the Md. Uniform Act), Md.Code (1984), §§ 9–201 to 9–224 of the Family Law Article (FL), and FL § 9–302 (the Special Act).

Appellant, Ann Harris (Harris), and the appellee, Jonathan Melnick (Melnick), were divorced *a vinculo matrimonii* in September 1980 by the Circuit Court for Baltimore County. The parties had one child, Jason Harris Melnick (Jason), born June 9, 1976. While the divorce proceedings were pending Harris and Jason moved to Aspen, Colorado. The change of residence was approved by a temporary custody order of February 1979. The final decree awarded Harris custody of Jason and granted Melnick visitation rights in accordance with an incorporated separation agreement. Colorado remains the domicile of Harris and Jason. Melnick has continuously resided in Maryland where Jason has regularly visited his father for the periods described in Part II, *infra*.

From time to time after the divorce Harris and Melnick skirmished in the Circuit Court for Baltimore County. The

dispute generating this appeal began, at least procedurally, in January 1985 when Melnick sought to extend Jason's visits with him in Maryland during Christmas and in February for a Caribbean vacation. Those issues were apparently resolved between the parties inasmuch as no court activity was docketed concerning that petition prior to June 2, 1987, when Melnick requested an emergency hearing. That request was prompted by a delay in Jason's departure from Colorado for his summer visit. The delay resulted from a disagreement over when Jason would return to Colorado at the end of his summer visit.

At a master's hearing on June 23 Harris appeared through counsel who filed a motion, with supporting memorandum, affidavit and exhibits, challenging the jurisdiction of the circuit court. Attached to the motion was a copy of a petition by Harris to the District Court, County of Pitkin, State of Colorado, dated June 11, requesting that court to assume jurisdiction over custody and visitation issues affecting Jason. In her Baltimore County motion Harris contended (1) that Colorado had exclusive jurisdiction or (2) that the circuit court should defer to the Colorado court. Both prongs of the argument were based upon the Md. Uniform Act. It is the Maryland version of the Uniform Child Custody Jurisdiction Act (the Uniform Act) which was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1968. 9 U.L.A. 111 *et seq.* (1979). A counterpart of the Uniform Act has also been enacted in Colorado. *See* Colo. Rev.Stat. §§ 14–13–101 to –126 (1987). Harris was not present at the hearing. The master heard testimony from witnesses called by Melnick.

In a report filed on June 24 the master concluded that the court had continuing jurisdiction and recommended an order concerning visitation which was entered immediately.[1] Har-

---

1. Visitation for the summer of 1987 was to be from June 25 until August 31 unless Jason, after arriving in Maryland, decided to terminate the visit on August 15. In succeeding summers visitation was to

ris filed exceptions. The circuit court concluded on November 18 "that the Master was correct ... in his belief that Maryland should retain jurisdiction in this case with regard to issues of custody and visitation in accordance with Family Law Article Sec[s]. 9–204 and 9–302."

FL § 9–204, which is, in substance, § 3 of the Uniform Act, reads:

"(a) *Grounds for jurisdiction.*—A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial decree or modification decree if:

(1) this State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceedings and the child is absent from this State because of the child's removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this State;

(2) it is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and the child's parents, or the child and at least 1 contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(3) the child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent;  or

(4)(i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with

begin two weeks after the close of school and extend to August 15.  In addition, Jason would visit Melnick for ten days at Christmas and ten days during the spring school holiday.  Melnick could visit Jason in Colorado whenever Melnick was there.

items (1), (2), or (3) of this subsection or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

(b) *Effect of physical presence.*—Except under subsection (a)(3) and (4) of this section, physical presence in this State of the child, or of the child and 1 of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination."

FL § 9-302 reads:

"(a) *Authority of court.*—An equity court has jurisdiction over custody and visitation of a child who is removed from this State by a parent of the child, if:

(1) the parents are separated or divorced and this State was:

(i) the marital domicile of the parents; or

(ii) the domicile in which the marriage contract was last performed;

(2) 1 of the parents was a resident of this State when the child was removed and that parent continues to reside in this State; and

(3) the court obtains personal jurisdiction over the parent who removes the child.

(b) *Effect of section.*—This section does not affect any other basis of an equity court's jurisdiction over custody and visitation of a child."

The circuit court then addressed the ruling sought by Harris which would "recogniz[e] that Colorado is now and will be for the future the only appropriate forum for the modification of the existing child custody decree." The court denied the requested ruling and cited FL § 9-204 as providing "for the continuing jurisdiction of this Court."

The circuit court's order denied Harris's motion. Since the motion raised the same jurisdictional objections which underpinned her exceptions to the master's report, the court's ruling effectively overruled the exceptions. From

that judgment Harris noted a timely appeal to the Court of Special Appeals.[2] We issued the writ of certiorari on our own motion prior to consideration of the appeal by the intermediate appellate court.

## I

Harris's principal argument rests on the Md. Uniform Act.[3] The Uniform Act speaks in terms of "jurisdiction" and the parties to this case have, in turn, couched their arguments in terms of "jurisdiction." As a preliminary matter it is well to keep in mind the historic distinction in

---

2. Under Md.Rule 2–541(b)(7) a requested "[m]odification of an existing order or judgment as to custody or visitation of children" is referred as of course to a master when a hearing has been requested. At the conclusion of his hearing on June 23 the master, as contemplated by Rule 2–541(f)(1), orally advised the parties of his proposed recommendation. The next day the master filed his report and recommendation and on June 26 the court entered the recommended order modifying visitation. Entry of an immediate order by the circuit court was permitted by Rule 2–541(g)(2)(B) which in relevant part reads:

   "Subject to a later determination by the court on any exceptions, the order proposed by the master

   . . . .
   (B) may be entered by the court immediately . . . modifying an existing order or judgment as to child visitation."

   Harris's exceptions were filed within ten days from the filing of the master's written report. Rule 2–541(h)(1). Inasmuch as an immediate order is "[s]ubject to a later determination by the court on any exceptions," Rule 2–541(g)(2), such an order remains interlocutory until the later of the expiration of the time for filing exceptions, without exceptions having been filed, or the entry of the court's ruling disposing of timely exceptions.

   In the instant matter Harris filed a "Motion to Alter Court Decision and Request for New Order" more than thirty days after the order of June 26 adopting the master's recommendation. Harris's motion sought to invoke the court's revisory power under Md.Rule 2–535(b) on the theory that the court had acted irregularly in entering an order before the time for exceptions had expired. The circuit court granted this motion to alter in order to consider the exceptions to the master's report. As indicated above, there was no irregularity. Nor was there any need to invoke any post-judgment rule of procedure inasmuch as the judgment was not final until the timely exceptions were decided.

3. Under the definition in FL § 9–201(c)(1) a judicial decision that relates to visitation rights is a " '[c]ustody determination.' "

equity between a court's possessing jurisdiction over the subject matter and the exercise of that jurisdiction. *See, e.g., Wakefield v. Little Light,* 276 Md. 333, 349–50, 347 A.2d 228, 237–38 (1975). We agree with the overview of the Uniform Act given by the Supreme Court of California in a case analogous to the one before us.

"The jurisdictional grounds for making a child custody determination are set out in section [3] of the Uniform Act [FL § 9–204]. Sections that follow address due process rights of the parties and prescribe appropriate procedures. Other sections, crucial to our determination, articulate the circumstances or situations in which the courts may or should decline to *exercise* jurisdiction. The sections relied upon ... fall in the latter category. We stress this point because both parties speak of either California or New York as lacking 'jurisdiction' to act in the instant matter, when the crucial question is really whether the Uniform Act directs or allows exercise of jurisdiction. As shall appear, it is obvious that each state can claim to have jurisdiction from among the multifaceted components of section [3 of the Uniform Act]."

*Kumar v. Superior Court,* 32 Cal.3d 689, 695, 652 P.2d 1003, 1006–07, 186 Cal.Rptr. 772, 775–76 (1982). Consequently, we shall rephrase the arguments presented by Harris and by Melnick to emphasize the distinction described above.

Harris submits that Colorado is the only state with jurisdiction over the subject matter. She bases that argument on FL § 9–204(a)(1), under which Colorado is the "home state" of Jason.[4] She also bases that argument on FL § 9–204(a)(2) because she contends that only Colorado meets the "significant connection" test of that subsection. Melnick does not dispute that Colorado is Jason's "home state." The father joins issue with Harris over the applica-

---

4. FL § 9–201(f) defines "home state" to mean "the state in which the child, immediately preceding the time involved, lived with ... a parent ... for at least 6 consecutive months[.]"

tion of FL § 9–204(a)(2) and contends that Maryland has "significant connection" jurisdiction over the subject matter. He further contends that FL § 9–302 gives the Circuit Court for Baltimore County jurisdiction over the subject matter. Harris responds by asserting that, even if each competing state has subject matter jurisdiction, the more significant contacts are with Colorado so that the Maryland court ought not exercise subject matter jurisdiction in keeping with the policy of the Md. Uniform Act. In this latter respect Harris emphasizes FL § 9–202 which in relevant part reads:

"(a) *General purposes.*—The general purposes of this subtitle are to:

. . . .

(3) assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and the child's family have the closest connection and where significant evidence concerning the child's care, protection, training, and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and the child's family have a closer connection with another state;

. . . .

(b) *Construction.*—This subtitle shall be construed to promote the general purposes stated in this section."

Neither party relies on FL § 9–214(a) or the comparable Colorado provision. As hereinafter explained that provision primarily controls whether a state is allowed to exercise subject matter jurisdiction to modify an existing custody order of another state. FL § 9–214(a) provides:

"If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court that rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this subtitle or has declined to assume jurisdiction to

modify the decree and (2) the court of this State has jurisdiction."[5]

FL § 9–214(a) is § 14(a) of the Uniform Act. The reporter for the Uniform Act was Professor Brigitte M. Bodenheimer whose extensive writings on that subject highlight the importance of § 14(a). *See generally The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand.L. Rev. 1207 (1969) (Bodenheimer I); *The Rights of Children and the Crisis in Custody Litigation: Modification of Custody in and out of State*, 46 U.Colo.L.Rev. 495 (1975) (Bodenheimer II); and *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA*, 14 Fam.L.Q. 203 (1981) (Bodenheimer III).

Professor Bodenheimer has described the legal background which brought about the promulgation of the Uniform Act.

"Under state law preceding the Uniform Act, courts have the power to modify their own custody decrees. They retain continuing jurisdiction to change their custody or visitation provisions, if circumstances have changed, or, under some laws, if the existing custody arrangement presents a danger to the child. This jurisdiction continues when the child is absent from the state.

"Prior to the Uniform Act, the courts of other states often assumed concurrent jurisdiction to modify a custody decree, if the child happened to be in their territory, without regard to the preexisting and continuing jurisdiction of the state of the original decree.... [C]oncurrent jurisdiction in several states to modify an existing custody judgment was a major cause of parental resort to kidnapping to gain a more favorable judgment in a new forum. The exercise of concurrent jurisdiction frequently resulted in collisions between the courts of different states which made contradictory custody awards.

---

5. The Colorado version, Colo.Rev.Stat. § 14–13–115 (1987), does not include "(1)" and "(2)." Otherwise it is identical.

"Some courts in a new state would express their readiness to recognize the custody decree of the state of continuing jurisdiction as a matter of comity, if not of full faith and credit, but in the same breath they would often take the position that circumstances had changed since the entry of the other state's decree, so that their transfer of custody to the other parent was warranted."

Bodenheimer III, at 213–14 (footnotes omitted).

She then explained the response in § 14 of the Uniform Act to the above-described problems.

"The UCCJA was designed 'to bring some semblance of order into the existing chaos.' In order to do so, the Act had to go further than simply codifying the principle of recognition of out-of-state custody decrees. It had to strengthen the continuing jurisdiction of the state of the initial decree; it had to insulate that jurisdiction from out-of-state interference; in other words, it had to bestow legal effect upon that continuing jurisdiction which operates beyond the state borders.

"Accordingly, Section 14 of the UCCJA provides that once 'a court of another state has made a custody decree, a court of this state shall not modify that decree.' In other words, the continuing jurisdiction of the prior court is exclusive. Other states do not have jurisdiction to modify the decree. They must respect and defer to the prior state's continuing jurisdiction. Section 14 is the key provision which carries out the Act's two objectives of (1) preventing the harm done to children by shifting them from state to state to relitigate custody, and (2) preventing jurisdictional conflict between the states after a custody decree has been rendered."

*Id.* at 214 (footnote omitted).

Bodenheimer further points out that "the rules governing modification jurisdiction are markedly different from the rules applicable to initial jurisdiction." *Id.* at 215 (footnote omitted). Initial jurisdiction is determined primarily by § 3 (FL § 9–204). *Id.*

"Modification jurisdiction, on the other hand, is governed primarily by Section 14, reinforced, where necessary, by the stronger clean hands rule of Section 8(b). As the Commissioners' Note to Section 6 states, 'once a custody decree has been rendered in one state, jurisdiction is determined by Sections 8 and 14.' This means that only one state—the state of continuing jurisdiction—has power to modify the custody decree. Only that state decides whether to decline the exercise of its jurisdiction in any particular case. The rule is clear and simple. There can be no concurrent jurisdiction and no jurisdictional conflict between two states."

*Id.* at 216.

Thus the Commissioners' Note to § 14 of the Uniform Act states in part that

"all petitions for modification are to be addressed to the prior state if that state has sufficient contact with the case to satisfy section 3 [FL § 9–204]. The fact that the court had previously considered the case may be one factor favoring its continued jurisdiction. If, however, all the persons involved have moved away or the contact with the state has otherwise become slight, modification jurisdiction would shift elsewhere."

9 U.L.A. at 154.

Bodenheimer's description of "the myth of concurrent modification jurisdiction," Bodenheimer III, at 216, is also on point here.

"Some decisions proceed on the erroneous assumption that both the state of the original decree and the state where the child subsequently resides for six months have jurisdiction to modify the original decree. They say that there is 'significant connection' jurisdiction in the state of the original decree and concurrent 'home state' jurisdiction in the new state.

"This 'concurrent jurisdiction' theory is incompatible with the clear language of the Act. Section 14 is unambiguous: if the state of the original decree has jurisdic-

tion, a court of another state 'shall not modify that decree.' In other words, the state of the prior decree alone has jurisdiction to modify its decree. This jurisdiction is exclusive. No other state has authority to hear a petition for modification."

*Id.* at 216–17 (footnote omitted).

Courts have recognized and applied the foregoing analysis of the Uniform Act. *See Kumar v. Superior Court,* 32 Cal.3d. 689, 652 P.2d 1003, 186 Cal.Rptr. 772 (1982); *Kraft v. District Court,* 197 Colo. 10, 593 P.2d 321 (1979) (en banc); *Hamill v. Bower,* 487 So.2d 345 (Fla.Dist.Ct.App. 1986); *Funk v. Macaulay,* 457 N.E.2d 223 (Ind.Ct.App. 1983); *In re Marriage of Leyda,* 398 N.W.2d 815 (Iowa 1987); *Kendall v. Whalen,* 526 A.2d 588 (Me.1987); *Clarke v. Clarke,* 126 N.H. 753, 496 A.2d 361 (1985); *Neger v. Neger,* 93 N.J. 15, 459 A.2d 628 (1983); *In re Marriage of Cotter,* 64 Or.App. 173, 666 P.2d 1382 (1983); *Sinclair v. Albrecht,* 287 S.C. 20, 336 S.E.2d 485 (1985); *Tennessee ex rel. Cooper v. Hamilton,* 688 S.W.2d 821 (Tenn.1985). The Uniform Act, § 14, duty of nonmodification is also explained in Coombs, *Interstate Child Custody: Jurisdiction, Recognition, and Enforcement,* 66 Minn.L.Rev. 711, 810–12 (1982). *See also* W. Richman & W. Reynolds, *Understanding Conflict of Laws* § 117, at 341 (1984) ("The basic rule under the UCCJA is continuing jurisdiction.").

The textual structure of the Uniform Act has undoubtedly helped to blur the distinction between initial jurisdiction and jurisdiction to modify, and to obscure the duty of nonmodification.[6] Indeed, Professor Bodenheimer has acknowledged that, if the Uniform Act were redrafted, the recognition, enforcement and nonmodification provisions might well be presented before the jurisdictional provision

---

6. For example, the first reported appellate decision in this State under the Uniform Act dealing with the modification of a custody decree of another state does not cite the predecessor to FL § 9–214. *Howard v. Gish,* 36 Md.App. 446, 373 A.2d 1280 (1977). The emphasis in that opinion was on how Maryland acquired jurisdiction as the new "home state."

which "is of far less practical importance[.]" Bodenheimer II, at 503. Further, the provisions presented in FL § 9–204 relate to subject matter jurisdiction both for initial decrees and for modification decrees, and the purposes enumerated in FL § 9–202 are presented without distinguishing between the two types of decrees. The Supreme Court of New Jersey has helpfully pointed out that the primary legislative purpose of the Uniform Act provisions concerning the initial award of custody is to assure that the litigation ordinarily takes place in the forum having the closest connection to the child and the child's family (FL § 9–202(a)(3)) while the legislative aims of avoiding jurisdictional competition, deterring abductions, avoiding relitigation of custody decisions and facilitating the enforcement of custody decrees of other states (FL § 9–202(a)(1), (5), (6), (7) and (8)) relate to enforcement and modification of custody decrees of another state. *Neger*, 93 N.J. at 25–27, 459 A.2d at 633–34.

Consequently, the issue to resolve here is whether Maryland has lost its continuing jurisdiction. If Maryland retained continuing jurisdiction over the subject matter, then the Md. Uniform Act does not restrain the exercise of that jurisdiction. Under that circumstance FL § 9–214(a) contemplates that continuing jurisdiction will be exercised and the Colorado counterpart statute instructs the courts of that state that they "shall not modify" the Maryland decree.

## II

The circuit court held that it had subject matter jurisdiction under both § 9–204(a) of the Md. Uniform Act and under the Special Act, FL § 9–302. The Md. Uniform Act followed the original enactment of § 9–302's predecessor. *Rypma v. Stehr*, 68 Md.App. 242, 511 A.2d 527 (1986) traced this history.[7]

---

7. We granted certiorari, 308 Md. 238, 517 A.2d 1120 (1986); however, the appeal was voluntarily dismissed by the parties before decision by this Court.

■ In the instant case all of the elements required under § 9–302 for continuing jurisdiction in the Circuit Court for Baltimore County are met so that that court was clearly correct in holding that it had jurisdiction under the Special Act. It is a statute which enlarges subject matter jurisdiction beyond that based on domicile of the child.[8] Nevertheless, because of the importance of the Uniform Act aspects of this case, we shall also review the circuit court's additional holding that it had jurisdiction under § 9–204.

■ Under the facts here the pertinent provision is FL § 9–204(a)(2) which requires that the child and at least one contestant have "a significant connection" with Maryland and that "there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships." Melnick has been a Maryland resident continuously since the separation from Harris. Although Jason has resided outside of Maryland for more than seven years prior to the order appealed from, he has regularly visited his father. The annual schedule seems to have been ten days at Christmas, ten days during the spring school vacation, a large portion of the summer, and, at least during one year, a late winter holiday in Jamaica. When he was younger, Jason attended a day camp in the Baltimore area for some portion of his summer visits with Melnick. More recently Jason has spent four weeks or more of his summer visitation at a camp in Maine. The evidence was that during each of the summers of 1984, 1985 and 1986 Jason spent approximately ten weeks with his father, including the time spent at camp at his father's expense. Melnick testified that "[w]e added it up and we come to about fourteen weeks [per year] is what I am getting Jason now."

---

8. We intimate no opinion on whether jurisdiction predicated solely on the Special Act may be a "jurisdiction under jurisdictional prerequisites substantially in accordance with" the Uniform Act, as the quoted words are used in § 14(a) of the Uniform Act [FL § 9–214(a) ] and as nearly identical words are used in § 3(a)(4) of the Uniform Act [FL § 9–204(a)(4) ].

With respect to testimony concerning the present and future effects of any custody or visitation modifications, Melnick is obviously an important witness. Jason's maternal grandfather, a physician, resides in Baltimore. He has in the past performed some mediation functions between Harris and Melnick and, inferentially, has relevant knowledge. Sherry Lynn Alban has for the seven years preceding the master's hearing lived with Melnick in his home. She has personal knowledge of the relationships between Melnick and Jason and between her and Jason. In addition she, and not Melnick, has been the person who speaks with Harris concerning the detailed arrangements for Jason's travels back and forth from Colorado to Maryland.

Judicial decisions interpreting the Uniform Act have not sharply delineated what quantum of facts constitutes "a significant connection" and "substantial evidence." Courts generally give the decree-rendering state a strong presumption of continuing modification jurisdiction until all or almost all connection with the parents and the child is lost. *See Kumar,* 32 Cal.3d at 699, 652 P.2d at 1009–10, 186 Cal.Rptr. at 778–79; *Neger,* 93 N.J. at 30–32, 459 A.2d at 636; *Hamilton,* 688 S.W.2d at 825. It has been said that "[n]ormally, only when the child and both parents have left the decree-rendering state is deference to the jurisdiction of the original court no longer appropriate." *Peery v. Superior Court,* 174 Cal.App.3d 1085, 1092, 219 Cal.Rptr. 882, 885 (1985). In an Iowa case the mother, who had custody under an original Florida decree, moved with the child to Iowa. Three years later, while the child was making his only visit during that period with the father in Florida, the father obtained a Florida decree awarding him custody. The Supreme Court of Iowa would not honor the Florida decree because that state had lost continuing jurisdiction. *Slidell v. Valentine,* 298 N.W.2d 599 (Iowa 1980). Although New Hampshire was the child's "home state," its supreme court refused to modify a New York custody order because the child, during the preceding three and one-half years of the parents' separation, had "had significant visitation in New

York with his father, who continue[d] to reside there." *Clarke*, 126 N.H. at 758, 496 A.2d at 365.

The Commissioners' Note to § 14 of the Uniform Act is also instructive on the circumstances causing the decree-rendering state to lose modification jurisdiction.

> "For example, if custody was awarded to the father in state 1 where he continued to live with the children for two years and thereafter his wife kept the children in state 2 for 6-½ months (3-½ months beyond her visitation privileges) with or without permission of the husband, state 1 has preferred jurisdiction to modify the decree despite the fact that state 2 has in the meantime become the 'home state' of the child. If, however, the father also moved away from state 1, that state loses modification jurisdiction interstate, whether or not its jurisdiction continues under local law. See Clark, Domestic Relations 322–23 (1968). Also, if the father in the same case continued to live in state 1, but let his wife keep the children for several years without asserting his custody rights and without visits of the children in state 1, modification jurisdiction of state 1 would cease."

9 U.L.A. at 154.

■ Given the fact that the Uniform Act is intended to apply to interstate custody disputes, even where the distances between the competing states may be great, the fact that Colorado has been Jason's "home state" for more than seven years does not per se divest Maryland's continuing jurisdiction. For instance, in *Funk v. Macaulay*, 457 N.E. 2d 223 (Ind.Ct.App.1983) an Indiana court held that it had continuing jurisdiction in custody modification proceedings even though the children had been domiciled with the custodial parent in California for the preceding ten years. The court found that Indiana "continued to maintain 'significant connections' with the litigants and the children" because the noncustodial parent remained in Indiana since the time of the divorce and the children visited that parent "at least twice each year, for one week at Christmas and six weeks in the summer." *Id.* at 227.

It is not uncommon in divorce situations for the noncustodial parent to remain in the state which rendered the original custody decree and in which that parent enjoys visitation rights, while the custodial parent lives in another state. In the instant matter the original custody decree, with subsequent minor tuning by the Circuit Court for Baltimore County and by practical accommodations between the parties, has managed to preserve substantial visitation with Melnick over the years. The Uniform Act does not require more for the jurisdiction of the originating state to continue.

### III

Even though the Circuit Court for Baltimore County had subject matter jurisdiction under both the Md. Uniform Act and the Special Act, and even though the Md. Uniform Act did not prevent the exercise of that subject matter jurisdiction, the circuit court nevertheless could have declined, in its discretion, to exercise that jurisdiction had it concluded that Maryland was an inconvenient forum, pursuant to FL § 9–207.[9] Harris's request for an order declaring

---

9. FL § 9–207 in relevant part provides:

"(a) *Action if this State is inconvenient forum.*—A court which has jurisdiction under this subtitle to make an initial decree or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

(b) *Who may move for finding of inconvenient forum.*—A finding of inconvenient forum may be made on the court's own motion or on motion of a party or a guardian ad litem or other representative of the child.

(c) *Factors in determination.*—In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose, it may take into account the following factors, among others:

(1) if another state is or recently was the child's home state;

(2) if another state has a closer connection with the child and the child's family or with the child and 1 or more of the contestants;

(3) if substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

that all applications concerning Jason's custody should be made to the Colorado court also urged the circuit court to apply § 9–207. The argument was based on Harris's affidavit which reflected that all of Jason's school records were in Colorado where he also participated in a ski club and hockey program and where he took karate and ceramic lessons. Harris concluded in her affidavit that "substantially all [of Jason's] personal relationships" were in the Aspen community.

In its order filed November 18, 1987, the circuit court exercised its discretion by denying that request. The court cited FL § 9–204 as its reason and we interpret that citation to mean that the policy of the Uniform Act to recognize continuing jurisdiction prompted the court's conclusion.

There was no abuse of discretion. In addition to the reason given by the circuit court, there is no indication in this record that Colorado would exercise "home state" jurisdiction rather than awaiting Maryland's decision on whether it would exercise continuing jurisdiction. Nor is there any indication that the Colorado court requested the records of the Circuit Court for Baltimore County, pursuant to the Uniform Act.[10] Finally, the affirmative relief granted by the circuit court had the effect of reducing the length

---

(4) if the parties have agreed on another forum that is no less appropriate; and

(5) if the exercise of jurisdiction by a court of this State would contravene any of the purposes stated in § 9–202 of this subtitle.

(d) *Communications with other courts.*—Before determining whether to decline or retain jurisdiction, the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties."

10. Colo.Rev.Stat. § 14–13–123 (1987), the counterpart to FL § 9–222, provides:

"If a custody decree has been rendered in another state concerning a child involved in a custody proceeding pending in a court of this state, the court of this state upon taking jurisdiction of the case shall request of the court of the other state a certified copy of the transcript of any court record and other documents mentioned in section 14–13–122 [FL § 9–221]...."

**558**

of Jason's visits with his father during the summer by approximately two weeks in relation to the length of those visits in the preceding three summers.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.