ROGER HOWARD ET AL. *v.* JAMES
L. GISH

[No. 1017, September Term, 1976.]

*Decided June 13, 1977.*

The cause was argued before GILBERT, C. J., and MORTON and MENCHINE, JJ.

*Robert Paul Phillips, III* and *J. Russell Robinson* for appellants.

*R. Noel Spence,* with whom were *William C. Wantz* and *Kaylor & Spence* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Roger Howard (natural father) and Inez C. Todd (maternal grandmother) appeal to this Court from a decree of the Circuit Court for Washington County, whereby custody of Lori Lynn Howard, age 10 years, was awarded to her stepfather, James L. Gish. The mother of the child had died on May 21, 1976, from injuries sustained when she fell from a horse.

The litigation developed under the following circumstances:

The body of Marcia Todd Gish had been taken to Darien, Georgia for burial. James L. Gish and Lori Lynn went to Georgia on Thursday. The funeral was scheduled for Saturday.

Between Thursday and Saturday, however, discussions took place among the father, grandmother and stepfather with respect to the future custody of the child. As a result, the stepfather and the child left Georgia without notice on Friday at about 10 p.m., prior to the funeral of the mother.

He explained that he had done so, "Because I had every indication and every belief that they was trying to take Lori from me then, they wasn't going to let me bring her back home. And, I had discussed it with Lori and she said to leave." He added that he had left Georgia in such precipitant fashion upon the advice of Georgia counsel.

His petition for custody was filed shortly after his return to Maryland.

The joint answer of the father and grandmother alleged, *inter alia:*

> ". . . that petitioner has never been able or willing to support himself or anyone else by steady gainful employment, but has, on the contrary, subsisted largely upon the efforts of others. He is not of proper character to maintain the stability in home

life that is requisite in the rearing of a young child; he is no relation to said child and has no standing to demand custody of said child. . . . that they are next and nearest of kin to the minor child, Lori Lynn Howard; that they deeply love said child; that they are jointly and severally physically, financially, and morally capable of rearing and caring for said child; that they jointly and severally desire and are entitled to custody of said child and that the best interests of said child require that custody of said child be awarded to them or to one of them."

The joint brief of the father and maternal grandmother makes the following contentions on appeal:

"I.   The Circuit Court for Washington County erred by not dismissing the petition for want of jurisdiction over the subject matter of the litigation in that the legal status of Lori Lynn Howard was dependent upon her domicile and under established . . . [law] domicile is Georgia and not Maryland.

II.   The Court erred in not adhering to the 'continuing jurisdictional rule' under which the court of the state which originally awarded custody retains jurisdiction to redetermine the best interests of the child upon the death of the spouse to whom it had originally awarded custody.

III.   The Court erred in awarding custody of the child to appellee because the evidence did not support a finding of unfitness as to appellants."

## I and II

We believe that passage in Maryland of the Uniform Child Custody Jurisdiction Act by Chapter 265 of the Laws of Maryland, 1975, and now codified as Article 16, §§ 184-207, inclusive, (1976 Cumulative Supplement) requires us to discuss contentions I and II together.

## The Undisputed Jurisdictional Facts

Lori Lynn Howard was born to the marriage of Roger Howard and Marcia Todd Howard (now deceased) on May 30, 1966, in the State of Georgia. Both parents were natives of that State and were married there in 1962.

After their marriage the Howards lived within voice range of the maternal grandmother's home in Darien, Georgia, from the time of their marriage until their separation in June 1970. The maternal grandmother cared for Lori Lynn during the day because both parents were employed during that period of her life.

The Howards were divorced in Georgia on June 5, 1970, with custody of Lori Lynn awarded by the Georgia court to the mother, Marcia Todd Howard. Mother and daughter lived with the maternal grandmother from June 1970 until three months after Marcia's marriage to James L. Gish on September 15, 1972.

Shortly thereafter the Gishes and Lori Lynn moved to Woodbridge, Virginia, where they resided until June 1975, when they moved to Hagerstown, Maryland. They moved from Hagerstown into rural Washington County, Maryland, in November 1975 and continued to reside there until the tragic death of the mother. The stepfather and Lori Lynn remained there as residents after the mother's death and were in residence there at the time of trial in the lower court.

## The Law as to Jurisdiction

By Chapter 265 of the Laws of Maryland, 1975, now codified as Article 16, §§ 184-207, inclusive, Maryland adopted the Uniform Child Custody Jurisdiction Act (the Act).

This case appears to be the first appellate examination of the jurisdictional aspects of the Act. We shall accordingly set forth in full herein the three sections of that Act that relate: (a) to the purposes intended to be served by the legislation (§ 184); (b) to the definitions of words and phrases used in the legislation (§ 185); and (c) to the

jurisdictional requisites in child custody cases (§ 186). We believe that those three sections make plain that the State of Maryland has jurisdiction and that the cases indicating Maryland's adherence to the "continuing jurisdictional rule" are, to the extent of any inconsistency with the statute, no longer controlling authorities.[1]

"§ 184. *Purpose and construction of subtitle.*

(a) The general purposes of this subtitle are to:

(1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;

(2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;

(3) Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and his family have a closer connection with another state;

(4) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

(5) Deter abductions and other unilateral removals of children undertaken to obtain custody awards;

(6) Avoid relitigation of custody decisions of other states in this State insofar as feasible;

(7) Facilitate the enforcement of custody decrees of other states;

---

1. *See* Berlin v. Berlin, 239 Md. 52, 57, *et seq.*, 210 A. 2d 380, 382, *et seq.* (1965).

(8) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerned with the same child; and

(9) Make uniform the law of those states which enact it.

(b) This subtitle shall be construed to promote the general purposes stated in this section.

"§ 185. *Definitions.*

In this subtitle the following words have the meanings indicated:

(1) *'Contestant'* means a person, including a parent, who claims a right to custody or visitation rights with respect to a child.

(2) *'Custody determination'* means a court decision and court orders and instructions providing for the custody of a child, including visitation rights; it does not include a decision relating to child support or any other monetary obligation of any person.

(3) *'Custody proceeding'* includes proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings.

(4) *'Decree'* or *'custody decree'* means a custody determination contained in a judicial decree or order made in a custody proceeding, and includes an initial decree and a modification decree.

(5) *'Home state'* means the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least 6 consecutive months, and in the case of a child less than 6 months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period.

(6) *'Initial decree'* means the first custody decree concerning a particular child.

(7) *'Modification decree'* means a custody decree which modifies or replaces a prior decree, whether made by the court which rendered the prior decree or by another court.

(8) *'Physical custody'* means actual possession and control of a child.

(9) *'Person acting as parent'* means a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody.

(10) *'State'* means any state, territory, or possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia. (1975, ch. 265, § 2.)

"§ 186. *When court has jurisdiction.*

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceedings, or (ii) had been the child's home state within 6 months before commencement of the proceedings and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this State and (i) the child has been abandoned or (ii) it is

necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

(b) Except under paragraphs (3) and (4) of subsection (a), physical presence in this State of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination.

(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

Briefly stated, the appellants maintain: (1) that the domicile of the father (Georgia) devolved upon the child by operation of law upon the mother's death and (2) that the decree of the Georgia court awarding custody to the mother was continuing in nature.

From these premises they argue (a) that Georgia, as the domiciliary State of the child, has exclusive jurisdiction with respect to custody and (b) that Georgia should be recognized as having exclusive jurisdiction under the "continuing jurisdiction rule" that Maryland has followed.

As to contention (a), appellants cite *Ross v. Pick*, 199 Md. 341, 86 A. 2d 463 (1952) and *Schwartz v. Schwartz*, 26 Md. App. 427, 338 A. 2d 386 (1975), cert. denied, 276 Md. 749 (1975), U. S. cert. denied, 423 U. S. 1088 (1976).

As to contention (b), appellants cite *Berlin v. Berlin*, 239 Md. 52, 210 A. 2d 380 (1965) and *Seidlitz v. Seidlitz*, 23 Md. App. 327, 327 A. 2d 779 (1974).

Assuming, without deciding, that in the absence of stat-

ute either or both contentions might have validity, we are persuaded that the Circuit Court for Washington County clearly had jurisdiction over custody of the child by reason of the uniform act.

It is quite clear that Maryland was the "Home State" as defined in § 185, *supra*; and that the proceedings below sought a "modification decree" as therein defined.

In view of the undisputed fact that Maryland was the home state of the child at the time of the commencement of the proceedings below and had been such for not less than eleven months prior to the death of the mother, we think the jurisdictional dispute must be resolved against the appellants by reason of § 186 of the Act, *supra*. The Circuit Court for Washington County had jurisdiction.

## III

### The Award of Custody

In a written opinion, to which was appended the decree awarding custody of the child to James L. Gish, her stepfather, the chancellor dealt almost summarily with the claims to custody made by the father and by the maternal grandmother, being content to say only the following:

> "It appears that Mr. Howard, although under an order to pay $50.00 per month for Lori Ann's [sic] support, has failed to do so, and even failed to communicate. He seems to have his hands full living in a mobile home with a new wife and three stepchildren. The real contest in this case is between the grandmother and the step-father.

> "Mrs. Todd is a loving grandmother who owns her own home. She rents out part and has a job as a waitress at a sea-food restaurant. In marital and other difficulties Mrs. Gish and Lori Ann [sic] stayed with Mrs. Todd, but not in the past several years."

The chancellor's brusque rejection of the father, by implication finding him unfit to have the custody of his

child, seems based upon the father's failure to support the child. The father had explained the failure was due to a lack of knowledge of the place of residence of the Gishes. We assume this explanation was rejected by the chancellor.

The chancellor's comment that the father "seems to have his hands full living in a mobile home" did not discuss the uncontradicted testimony of the father (a) that he is regularly employed by the Brunswick Pulp and Paper Company; (b) that his gross earnings in 1975 were $14,454.13; and (c) that he had bought a new four bedroom brick and stucco ranch home into which he [2] planned to move upon his return to Georgia following the trial below.

The chancellor's expressed basis for the award of custody to the stepfather was even more terse, being limited to the following:

> "The Court considers the best interests of the child; here the Court finds that her best interests will be served by awarding her custody to her stepfather, the plaintiff, who has shown his concern for her in a number of ways."

We are mindful that the right of a parent to the custody of his child will "not be enforced inexorably, contrary to the best interest of the child," *Ross v. Hoffman*, 280 Md. 172, 372 A. 2d 582 (1977) but "may be forfeited where it appears that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interest of the child." *Ross v. Pick*, 199 Md. 341, 351, 86 A. 2d 463, 468 (1952).

We are mindful also that our review of factual findings of the chancellor are governed by the "clearly erroneous" standard fixed by Maryland Rule 1086 and that "an appellate court cannot set aside factual findings unless they are clearly erroneous." *Davis v. Davis*, 280 Md. 119, 372 A. 2d 231, 233 (1977). The Court in *Davis, supra,* however,

---

2. The child's father having remarried, the household would include his wife and her three children, aged 11, 14 and 15 years.

distinguished "factual findings" of the chancellor from the latter's ultimate conclusion as to custody, saying at 124-25 [233-34]:

". . . there is some confusion in our cases with respect to the standard of review applicable to the chancellor's ultimate conclusion as to which party should be awarded custody. Notwithstanding some language in our opinions that this conclusion cannot be set aside unless clearly erroneous, *see, e.g., Spencer v. Spencer,* 258 Md. 281, 284, 265 A. 2d 755, 756 (1970) (per curiam); *Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 26, 265 A. 2d 264, 266 (1970), we believe that because such a conclusion technically is not a matter of fact, the clearly erroneous standard has no applicability. However, we also repudiate the suggestion contained in some of our predecessors' opinions, *see, e.g., Melton v. Connolly,* 219 Md. 184, 188, 148 A. 2d 387, 389 (1959); *Butler v. Perry,* 210 Md. 332, 339-40, 123 A. 2d 453, 456 (1956); *Burns v. Bines,* 189 Md. 157, 164, 55 A. 2d 487, 490 (1947); *cf. Ex Parte Frantum,* 214 Md. 100, 105, 133 A. 2d 408, 411, *cert. denied,* 355 U. S. 882, 78 S. Ct. 149, 2 L.Ed.2d 112 (1957) (adoption case), and relied upon by the Court of Special Appeals in *Sullivan v. Auslaender,* 12 Md. App. 1, 3-5, 276 A. 2d 698, 700-01 (1971), and its progeny, *see, e.g., Sartoph v. Sartoph,* 31 Md. App. 58, 64 & n. 1, 354 A. 2d 467, 471 (1976); *Vernon v. Vernon,* 30 Md. App. 564, 566, 354 A. 2d 222, 224 (1976), that appellate courts must exercise their 'own sound judgment' in determining whether the conclusion of the chancellor was the best one. Quite to the contrary, it is within the sound discretion of the chancellor to award custody according to the exigencies of each case, *Miller v. Miller,* 191 Md. 396, 407, 62 A. 2d 293, 298 (1948), and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion."

*The Record Below*

The chancellor's opinion had declared that he found "that her best interests will be served by awarding her custody to her stepfather, the plaintiff, who has shown his concern for her in a number of ways."

We find appellate evaluation of that conclusion impossible because the record below produces more questions than answers respecting the fitness of Gish to have custody of this ten year old child. The testimony of Gish alone developed the following facts:

James L. Gish, a native of Hagerstown, Maryland, was married to the deceased mother, Marcia Todd Gish, on September 15, 1972, in Darien, Georgia. He had previously been married three times. The first marriage lasted six months with no children born of the marriage. The second marriage lasted between two and three years with two children, a boy and a girl, born as a result of that marriage. A third marriage lasted three months. No children were born of the third marriage. All three marriages ended in divorces obtained by the wives. Gish explained "it was just a mutual agreement on both parties that we wanted it terminated."

The children of Mr. Gish by his second marriage were four and five years old at the time of the hearing below. Asked whether he had always paid child support on a regular basis, Gish responded "I've always paid child support, but not a regular basis, no. It was easier for me to pay it in lump sums than it was weekly." [3] Contradicting that testimony was a subsequent acknowledgment that he had been confined upon charges of non-support "when Marcie and I was ready to go off on our honeymoon."

More disturbing is his acknowledgment that he had not seen his own children for three years, although he explained that "its not because I don't want to." He acknowledged that there had been unsuccessful court proceedings in an effort to

---

3. The record fails to reflect any light upon the question whether the mother having custody of those two children would find it easier to receive her monies in such a feast or famine manner.

see his children that culminated in "a stipulation by the court that I cannot see those kids." He said there was a "court order that prevents [me] from seeing [my] natural children." No explanation appears in the record for the entry of such a stipulation or for the passage of such an order.

Other testimony by a deputy sheriff of Macintosh County, Georgia, where Gish at one time had conducted a service station, was to the effect that the latter's reputation in the community for honesty and integrity wasn't good.

No investigation of any kind was made with respect to the circumstances noted herein. We think some doubt necessarily arises from their recitation as to Gish's fitness to receive custody of the child as against the claims of her natural father and her maternal grandmother. That doubt cries out for resolution.

In such circumstances, we believe it appropriate to make no judgment at this time upon the ultimate issue but will remand the case without affirmance or reversal for a plenary hearing in which the chancellor in making his determination as to where the best interest of the child lies, should require such investigative report and recommendations and cause the production of such testimony and other evidence as may be necessary for a fair hearing. *Jester v. Jester,* 246 Md. 162, 228 A. 2d 829 (1967).

It may be that the chancellor may desire to utilize the authority conferred by § 201 of the Act to request the appropriate court in Georgia "to hold a hearing to adduce evidence, to order a party to produce or give evidence under other procedures of that state, or to have social studies made with respect to the custody of a child involved in proceedings pending in the court of this State; and to forward to the court of this State certified copies of the transcript of the record of the hearing, the evidence otherwise adduced, or any social studies prepared in compliance with the request. The cost of the services may be assessed against the parties, or, if necessary, ordered paid by the State." Additionally, the chancellor should issue a request for court records and documents from Georgia under the authority of § 204 of the Act; should consider the requisites for modification of an

out-of-state decree as required by § 196, and after the plenary hearing, give consideration to the question whether the Maryland court is an inconvenient forum within the meaning of § 189, or justifies declining jurisdiction in Maryland under § 190 of the Act.

> *Remanded for further proceedings*
> *consistent with this opinion.*
> *Costs to be paid by the appellee.*