511 A.2d 527

Jacqueline A. (Stehr) RYPMA,

v.

Joseph M. STEHR, III.

No. 1427, Sept. Term, 1985.

Court of Special Appeals of Maryland.

July 9, 1986.

Certiorari Granted Dec. 5, 1986.

**244**

Allen J. Kruger (with whom were Kristen I. Schoeck and Goldman, Kruger, Kovelant, Hurt, Hollmann & Kaiser, on brief), Laurel, for appellant.

Jess Joseph Smith, Jr., Upper Marlboro, for appellee.

Argued before WEANT, ADKINS and ROBERT M. BELL, JJ.

ADKINS, Judge.

In 1978, the Circuit Court for Prince George's County granted appellee, Joseph M. Stehr, III, an absolute divorce from appellant, Jacqueline A. (Stehr) Rypma. Custody of the couple's child, Paul, was awarded to Jacqueline. Joseph was ordered to pay his former wife $200 per month in child support but was granted visitation rights. This was the unremarkable beginning of a remarkably long and convoluted litigation.

This case, which has survived numerous master's reports, circuit court rulings, a decision by the Court of Special Appeals and a denial of certiorari by the Court of Appeals, now presents us with these questions:

    1.  Did the trial court err in determining that because the original divorce proceedings resolving custody were held in Maryland, this state retains subject matter jurisdiction over custody related issues even though Paul has long resided in Iowa?

    2.  Did the trial court err in failing to award to appellant her attorney's fees, expert witness fees, and travel expenses?

As our answer to both of these two questions is "no," we shall affirm the ruling of the trial court. Before we explain our conclusions, we provide a history of this affair.

### Facts

Shortly following her divorce from Joseph, Jacqueline married Craig Rypma. In July 1980, because of a requirement of Craig's doctoral program, Jacqueline and Paul moved to Iowa. A dispute then arose as to Joseph's rights to visit Paul. Eighteen months after Paul's move to Iowa, Joseph filed a petition seeking clarification of his visitation rights and an order enjoining Craig and Jacqueline from changing Paul's surname from Stehr to Rypma.

A show cause hearing was held and a master's report was issued. Joseph filed exceptions. The circuit court judge, concluding that Joseph was not allowed enough visitation time, granted the exceptions, and remanded the case to the master.

After a second hearing and issuance of a master's report, both parties filed exceptions. This time the judge adopted the report with one change regarding child support payments. Both parties appealed to this court. We affirmed the part of the trial court's decree that increased Joseph's visitation rights and enjoined the use of Rypma as Paul's surname. We reversed, however, on the issue of attorney's fees and other expenses and remanded the case to the trial court, ordering the chancellor to determine what, if any, award for fees and expenses would be proper.

Jacqueline petitioned the Court of Appeals for a writ of *certiorari*, raising, for the first time, the issue of whether the circuit court had subject matter jurisdiction over the custody phase of the cases. The petition was denied *sub nom. Stehr v. Stehr*, 301 Md. 43, 481 A.2d 802 (1984).

In the meantime, the master filed a second supplemental report, recommending that each party bear his or her own attorney's fees and expenses. Jacqueline excepted. She also filed a supplemental motion to strike and/or motion to

revise judgment, again raising the issue of subject matter jurisdiction.

By way of a third supplemental report, Master David K. Rumsey recommended that each side bear its costs and that Jacqueline's motion challenging the court's subject-matter jurisdiction be denied. These recommendations were adopted by Prince George's County Circuit Court Judge David G. Ross in an order and a judgment issued on September 10 and October 4, 1985. This appeal by Jacqueline followed.

## 1. *Subject-Matter Jurisdiction*

Jacqueline argues that the order and judgment issued by Judge Ross should be voided because the trial court lacked subject-matter jurisdiction over the custody related issues of visitation rights and the attempted change of Paul's surname.

For his part, Joseph raises several rebuttal arguments. We may focus our attention, however, on just one.[1]

---

**1.** Joseph raises two other concerns. First, he maintains that the denial of *certiorari* by the Court of Appeals had a *res judicata* effect that precludes us from considering this issue (the question of subject-matter jurisdiction). The denial of *certiorari*, however, produced no such thing, because such a denial lacks any precedential value. *See Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 365, 93 S.Ct. 647, 650, 34 L.Ed.2d 577 (1973); *State of Maryland v. Baltimore Radio Show,* 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950); *Houghton v. County Commissioners of Kent County,* 305 Md. 407, 417, 504 A.2d 1145 (1986) (McAuliffe, J., dissenting). *See also Calandra v. Rothwax,* 65 N.Y.2d 897, 493 N.Y.S.2d 304, 482 N.E.2d 1220 (1985). Second, Joseph argues that the custody related issues before us are really matters of in personam jurisdiction rather than subject-matter jurisdiction. From this point, Joseph urges us to conclude that Jacqueline in effect has waived her jurisdictional argument because she did not raise this defense in a preliminary motion to dismiss, as mandated by Md. Rule 2–322(a). We decline to do so. Parties cannot confer subject-matter jurisdiction on a court. The question presented here, whether a Maryland court has jurisdiction over custody related matters, is one of subject-matter jurisdiction. This has always been so, both before the Maryland Uniform Child Custody Jurisdiction Act (*see, e.g., Miller v. Miller,* 247 Md. 358, 363, 231 A.2d 27 (1967)) and after its enactment (*see Olson v. Olson,* 64 Md.App. 154, 494 A.2d 737 (1985)). A question of subject-matter jurisdiction can be raised at any

It concerns the appropriate law to apply. We have two choices: Md.Code Annotated, Family Law Art., § 9–204 and Family Law Art., § 9–302.

If, as Jacqueline argues, Family Law Art., § 9–204 controls this proceeding, then the court lacked authority to rule on child custody issues. The provision reads in pertinent part:

§ 9–204. When court has jurisdiction.

(a) *Grounds for jurisdiction.*—A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial decree or modification decree if:

(1) this State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceedings and the child is absent from this State because of the child's removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this State;

(2) it is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and the child's parents, or the child and at least 1 contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(3) the child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (i) it appears that no other state would have jurisdiction under prerequisites substantially in accord-

---

time, including on appeal. *Stewart v. State,* 287 Md. 524, 527–28, 413 A.2d 1337 (1980).

ance with items (1), (2), or (3) of this subsection or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

We recognize that none of the four alternative grounds for conferring jurisdiction was present in this case. First, Maryland is not the home state of Paul, nor was it within six months of the start of this proceeding, which began with the filing of Joseph's petition for clarification of order and show cause order in 1981. Secondly, Paul lacks a significant connection with Maryland, as required under § 9–204(a)(2). The time spent by Paul in this state, a few vacation weeks with Joseph, is insufficient. *See Olson v. Olson,* 64 Md.App. 154, 494 A.2d 737 (1985).

■ Moreover, the requirement of (a)(2)(ii) has not been met. No showing has been made of "substantial evidence" in Maryland concerning Paul's "present or future care, protection, training, and personal relationships." Because Paul is not physically present in Maryland, § 9–204(a)(3) may be eliminated. Lastly, Iowa's apparent though unexercised claims to jurisdiction bar the use of § 9–204(a)(4).[2]

On the other hand, the court would enjoy jurisdiction if § 9–302 governs. This provision reads:

---

**2.** Joseph includes in his appendix a copy of a Petition for Modification that Jacqueline filed in an Iowa District Court on October 30, 1985, 21 days after she had filed a notice of appeal of the case *sub judice*. The petition does not disclose whether the Iowa court accepted or declined jurisdiction. In any event, the petition does not appear in the record, nor was it before the trial court. We, therefore, do not consider it. We faced a similar evidentiary problem in *Casson v. Joyce,* 28 Md.App. 634, 638, 346 A.2d 683 (1975). We stated:

> On appeal we are confined to the record made in the court below. In the case at bar the file contains, *but the record does not include* what purports to be a letter supporting appellant's third contention. Unless the *record* contains that or other evidence … we may not go beyond it for additional facts.

*Casson,* 28 Md.App. at 638, 346 A.2d 683 [emphasis in original]. Similarly, we now do not look beyond what is included in the record from the trial court.

§ 9–302. Jurisdiction over custody and visitation.

(a) *Authority of court.*—An equity court has jurisdiction over custody and visitation of a child who is removed from this State by a parent of the child, if:

(1) the parents are separated or divorced and this State was:

(i) the marital domicile of the parents; or

(ii) the domicile in which the marriage contract was last performed;

(2) 1 of the parents was a resident of this State when the child was removed and that parent continues to reside in this State; and

(3) the court obtains personal jurisdiction over the parent who removes the child.

(b) *Effect of section.*—This section does not affect any other basis of an equity court's jurisdiction over custody and visitation of a child.

Jacqueline and Joseph were married in Maryland. This satisfies § 9–302(a)(1). Joseph was a resident of Maryland when Paul was removed, and he continues to reside here. This satisfies (a)(2). The last provision is met also, as Jacqueline has appeared in court in this matter.

We conclude that § 9–302 governs this case. We explain.

■ Perhaps the best way to begin is to review the history of §§ 9–302 and 9–204, the two apparently conflicting provisions. They are in apparent conflict because, as we have seen, § 9–204 seems to deny jurisdiction to a Maryland court, whereas § 9–302 seems to grant it. Although both were re-enacted when the revised Family Law Article was adopted by Chapter 296, Acts of 1984, § 9–302 is the older of the two. Its substantively identical antecedent is Art. 16, § 66(f), which was enacted in 1968. We may infer from the history outlined in *In re Karol*, 11 Md.App. 400, 274 A.2d 407 (1971) that § 66(f) was enacted to close a loophole in the custody jurisdiction law existing at that time. Until 1968, Maryland followed only the "domicile" rule with respect to custody jurisdiction. That is, a

state court was said to have jurisdiction to determine custody of a child only if the domicile of the child was within the state. Significantly, with the decision of *Berlin v. Berlin*, 239 Md. 52, 210 A.2d 380 (1965), the Court of Appeals had expanded the concept so that a Maryland court which had initial jurisdiction over a child because of the domicile rule could retain continuing jurisdiction over it even if it became a domiciliary of another state. *Miller v. Miller*, 247 Md. 358, 231 A.2d 27 (1967), however, exposed a loophole in the expanded version of this rule. In *Miller*, the Maryland court did not have initial jurisdiction over the children at issue (a Florida court, not the Maryland court, passed the original decree of custody); thus the Court of Appeals held that *Berlin's* continuing jurisdiction concept did not apply and that the Maryland court was required to give full faith and credit to the Florida decree.

When the General Assembly next met after *Miller* was decided, it enacted § 66(f), which eliminated the necessity of showing initial jurisdiction through the child's domicile. As *In re Karol* stated, after § 66(f) "the domicile of the child is no criterion of jurisdiction." 11 Md.App. at 404, 274 A.2d 407. The concept of continuing jurisdiction, however, was retained and linked not to original jurisdiction over the child but to a new three-part prerequisite involving 1) Maryland's being the matrimonial domicile of the parties or the domicile where the marriage contract was last performed; 2) Maryland residency of one of the parties to the marriage; and 3) the court obtaining personal jurisdiction of the party removing the child.

This history is critical. From it, we can distinguish the continuing jurisdiction notion as espoused in *Berlin* from the one in § 66(f), as each is predicated upon a different set of circumstances.

Additionally, it is significant to note the last provision of § 9–302(b), which also appeared in a lengthier form in § 66(f): "This section does not affect any other basis of an equity court's jurisdiction over custody and visitation of a

child." The existence of § 9–302(b) underscores the independent status of the section.

The history of § 9–204 is far different from that of § 9–302. Section 9–204 is part of the Maryland Uniform Child Custody Jurisdiction Act (the Uniform Act). The Uniform Act was enacted in 1975, four years after *Karol* was decided. A key to interpreting § 9–204 (codified as Art. 16, § 186 until 1984) is recognition that Maryland's intent in adopting the Uniform Act of which it is a part was to help create one law that would be uniform in jurisdictions adopting the Uniform Act. Indeed, the legislature tolerated only small variances from the model's text so that general uniformity of construction could be retained. *See* General Revisor's Note, § 9–224. This desire explains why § 9–204 does not incorporate or refer to § 9–302 but stands apart from it.

Armed with a general understanding of the origins of § 9–204 and § 9–302, we may now explore the relationship between the two. Logically, only one of three relationships can exist. Either a) § 9–302 nullifies § 9–204, or b) § 9–204 nullifies § 9–302, or c) each exists independently.

Of course, the very fact that both § 9–204 and § 9–302 appear in the Code is some basis for assuming that neither precludes the other. As the Court stated in *Equitable Life Assurance Society of the United States v. Jalowsky*, 306 Md. 257, 508 A.2d 137 (1986): "We have long held that 'in construing legislative enactments, all statutes relating to the same subject matter are to be considered and harmonized as far as possible'" (quoting *May v. Warnick*, 227 Md. 77, 83, 175 A.2d 413 (1961)). *See also Farmers & Merchants National Bank of Hagerstown v. Schlossberg*, 306 Md. 48, 61, 507 A.2d 172 (1986) ("Because the General Assembly is presumed to have intended that all enactments operate together as a consistent and harmonious body of law, statutes will be interpreted, whenever reasonably possible, to avoid repeal by implication"). In this situation,

however, it may be worthwhile to show additional reasons why this is so.

First, to conclude that § 9–302 precludes § 9–204 would be absurd. Section 9–204 is of later origin. It has been cited quite recently by us in *Olson.* We quickly can discard this possibility.

The second possibility, though, is more tempting. From reading *Olson* and *Howard v. Gish,* 36 Md.App. 446, 373 A.2d 1280 (1977), we might conclude that § 9–204 negates the concept of continuing jurisdiction and, consequently, the essence of § 9–302. As *Olson* stated:

> "As we stated in *Gish,* and reaffirm today, the cases indicating Maryland's adherence to the 'continuing jurisdiction rule' are, to the extent of any inconsistency with the statute, no longer controlling authorities."

*Olson,* 64 Md.App. at 167–168, 494 A.2d 737 [citation omitted]. *Olson,* however, expressly based its concept of continuing jurisdiction on the *Berlin* case; neither § 9–302 nor Art. 16, § 66 is mentioned. As we have seen, the statutory concept of continuing jurisdiction rests on a different basis from that in *Berlin;* we may conclude, therefore, that § 9–302 remains unaffected by the Uniform Act. Support for this conclusion can be seen in an opinion of the Court of Appeals, which recently has acknowledged the undiminished vitality of § 9–302. In a footnote to *Evans v. Evans,* 302 Md. 334, 488 A.2d 157 (1985)—a case that was decided a decade after the enactment of the Act and eight years after *Gish* —the court stated:

> Chapter 678 of the Acts of 1968 added Code (1957, 1966 Repl.Vol.) Art. 16, § 66(f) to provide, under certain circumstances, continuing jurisdiction over 'custody or visitation rights' of children removed from the State. This provision is codified as § 9–302 of the Family Law Article.

*Evans,* 302 Md. at 338 n. 3, 488 A.2d 157. We can conclude, then, that the Court of Appeals does not believe that § 9–302 has been emasculated by the Act.

Alternatives (a) and (b) have been disposed of. What remains is alternative (c); namely, that the two provisions exist independently. Happily, we need not be content to back into this conclusion by negative inference. We can reach it on the strength of the fact that at least four cases have used Art. 16, § 66(f) since 1975, when the Uniform Act went into effect. They are *Wakefield v. Little Light*, 276 Md. 333, 347 A.2d 228 (1975); *Colburn v. Colburn*, 45 Md.App. 313, 412 A.2d 1309 (1980); *Franciscus v. Franciscus*, 31 Md.App. 78, 354 A.2d 454 (1976); and *Sami v. Sami*, 29 Md.App. 161, 347 A.2d 888 (1975), *cert. denied*, 277 Md. 740 (1976).

■ The *Wakefield* case is most important. The case involved a couple who desired to gain custody over a Crow Indian child in a Maryland court. One of the issues before the Court of Appeals was whether the Maryland circuit court had jurisdiction. During the pendency of the appeal, the Uniform Act became effective in Maryland. The court noted that the effect of the Uniform Act was to broaden substantially the jurisdiction of Maryland courts because considerations other than the child's domicile could now be entertained. *See Wakefield*, 276 Md. at 349, 347 A.2d 228. Passage of the Uniform Act, however, did not deter the Maryland court from ignoring it, reverting to the traditional domicile rule, and holding that the lower Maryland court properly declined to interfere with the jurisdiction over the custody of the child because the child's domicile had remained in the Crow Indian reservation in Montana. The court stated that the "unique facts" of the case dictated this choice. *See Wakefield*, 276 Md. at 349–50, 347 A.2d 228.

Additionally, *Colburn v. Colburn*, decided three years after *Howard v. Gish*, applied Art. 16, § 66(f). In its opinion, which concerned a custody fight over a retarded adult, the court declared:

Jurisdiction over visitation rights to this 'minor child' is vested in the Circuit Court for Anne Arundel County by the Terms of Article 16, Section 66(f) . . . as the parties

fall squarely within the provisions of that section. It is clear, then, that the chancellor did not err when he found continuing jurisdiction existing in the Circuit Court.

*Colburn,* 45 Md.App. at 320, 412 A.2d 1309.

Similarly, *Sami v. Sami* made no reference to the Uniform Act when it applied Art. 16, §§ 66(f). *Franciscus v. Franciscus* ignored the Act (although it did acknowledge in a footnote another provision of Laws 1975, Ch. 265, the Uniform Act's enacting legislation; *see Franciscus,* 31 Md. App. at 79 n. 2, 354 A.2d 454). What is also remarkable is that *Franciscus* recognized the principle that multiple sources of jurisdictional power exist in Maryland law, and that if a court cannot obtain jurisdiction from one source it may nevertheless obtain it from another. In *Franciscus,* the court held that Art. 16, § 66(f) was inoperative because the factual requirements necessary for the application of the statute were missing. The court, however, then applied the old domiciliary rule and held that, under it, the court retained jurisdiction.

Our holding today does not run contrary to the policy underlying the Uniform Act, nor to the holdings of *Olson* and *Howard.* The principles stated in § 9–202 concern the avoidance of jurisdictional conflict and confusion. Just that sort of potential conflict existed in *Olson,* where there was the possibility of continuing jurisdiction in a Rhode Island court which had, long prior to the Maryland proceedings, entered a divorce decree and provided for child custody. 64 Md.App. at 157, 494 A.2d 737. A similar situation existed in *Howard v. Gish,* 36 Md.App. at 449, 373 A.2d 1280. In both of those cases, when we said that the Uniform Act had modified the continuing jurisdiction rule (*Olson,* 64 Md.App. at 157, 494 A.2d 737; *Howard,* 36 Md.App. at 450, 373 A.2d 1280), we were speaking within that factual context. We concluded that when another state had once exercised custody jurisdiction, the Uniform Act precluded us from giving effect to that state's continuing jurisdiction, if a Maryland

court had custody jurisdiction under the explicit provisions of the Uniform Act.

■ Here, the opposite is true. Iowa did not exercise custody jurisdiction before a Maryland court's power was involved. All the initial proceedings were in Maryland. So far as the record before us is concerned, there are none in Iowa. Under these circumstances, with the Uniform Act inapplicable, we conclude that, as in the *Wakefield* "unique fact" situation, § 9–302 continues to operate. The question, in effect, is: When does custody jurisdiction of a Maryland court attach when the Uniform Act does not apply, and when Maryland jurisdiction is unimpeded by the prior or existing competing jurisdiction of another state? We hold that § 9–302 provides the answer. When, as in this case, its prerequisites are satisfied, it gives a Maryland court subject-matter custody jurisdiction.[3]

### 2. *Fees and Expenses*

When this case was last before us, we held that there had been substantial justification for Jacqueline to defend against Joseph's visitation petition as well as to seek an increase in child support. We, therefore, reversed the part of the chancellor's decree that denied attorney's fees and other expenses to Jacqueline and remanded the case, instructing the chancellor to

> consider the financial status of both parties and their respective needs and then decide what, if any, award would be just and proper under all the circumstances. We emphasize that we are not ordering the chancellor to make an award. Rather, we only wish to make certain

---

**3.** We emphasize the limited nature of this holding. As we have said, it is based on the "unique facts" of this case—notably the lack of any evidence of custody proceedings pending in Iowa. Were such proceedings shown to exist, a Maryland court would lack jurisdiction under § 9–204(a)(4)(i). In that circumstance, we believe that the purposes underlying the Uniform Act would override § 9–302 so that a Maryland court could not claim jurisdiction under the latter statute.

that his denial of an award is not based on an improper determination that appellant lacked substantial justification in defending the action.

The second supplemental report and recommendations, which the chancellor adopted, do not clearly show abuse of discretion in light of these instructions.

Concededly, much of the report seems to be written to rebut the holding of this court that Jacqueline had substantial justification in defending the suit. This discussion is irrelevant. But the report did note that according to appellant's "own financial statement," Jacqueline earns $24,000 a year and her husband earns $10,800. Jacqueline seems to attempt to undermine Master Rumsey's reasoning by noting that he previously determined her salary to be $22,000. Such an increase in estimation is plausible given the fact that the $24,000 estimate was made in 1984 and the $22,000 estimate was made a year earlier.

■ Jacqueline also complains that Master Rumsey did not consider Joseph's own substantial financial resources. Even if Jacqueline is correct in this charge, no reversible error was committed. We believe that the purpose for considering the financial status of both parties is simply to inquire whether each will be able to absorb any fees or expenses awarded against him or her. *Cf. Jackson v. Jackson,* 272 Md. 107, 112, 321 A.2d 162 (1974) (where the court concluded that circumstances favored the payment of appellant's counsel fees by appellee, and that appellant's financial status "certainly permitted the award"). Judge Ross, upon review of the evidence and Master Rumsey's third supplemental report, had the discretion to decide that Jacqueline had the ability to pay her fees and expenses without any help from Joseph. Joseph's financial status, in this circumstance, would have had no significance.

JUDGMENT AFFIRMED. APPELLANT TO PAY THE COSTS.